1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2

3      - - - - - - - - - - - - - - - - - - x

4      UNITED STATES OF AMERICA,              :

5              Plaintiff,                     :

6          v.                                 :   Criminal Action No.
                                                  1:19-cr-10081-IT-7
7      MARTIN FOX,                            :

8              Defendant.                     :

9      - - - - - - - - - - - - - - - - - - x

10

11      BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE

12

           SENTENCING HEARING BY VIDEOCONFERENCE
13

14

                   Friday, November 13, 2020
15                        2:34 p.m.

16

17

18

19

20
       John J. Moakley United States Courthouse
21     Courtroom No. 9
       One Courthouse Way
22     Boston, Massachusetts

23
       Robert W. Paschal, RMR, CRR
24     Official Court Reporter
       rwp.reporter@gmail.com
25

1                      **A P P E A R A N C E S**

2

     On behalf of the Government:

3

         UNITED STATES ATTORNEY'S OFFICE
4        BY:  KRISTEN A. KEARNEY
         1 Courthouse Way
5        Suite 9200
         Boston, MA  02210
6        (617) 748-3204
         kristen.kearney@usdoj.gov
7


8
     On behalf of the Defendant:
9
         GERGER KHALIL & HENNESSY LLP
10       BY:  DAVID GERGER
         1001 Fannin Street
11       Suite 2450
         Houston, TX  77002
12       (713) 224-4400
         dgerger@gkhfirm.com
13
         and
14
         ANDERSON & KREIGER LLP
15       BY:  MICHAEL J. PINEAULT
         50 Milk Street
16       21st Floor
         Boston, MA  02109
17       (617) 621-6578
         mpineault@andersonkreiger.com
18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1               (In open court at 2:34 p.m.)

2               THE DEPUTY CLERK:  United States District Court is

3 now in session, the Honorable Judge Indira Talwani presiding.

4               This is Case Number 19-cr-10081, United States

5 versus Martin Fox.  Will counsel please identify themselves

6 for the record.

7               MS. KEARNEY:  Good afternoon, Your Honor.  Kristen

8 Kearney for the United States.

9               THE COURT:  Good afternoon.

10              MR. GERGER:  Good afternoon, Your Honor.  I'm David

11 Gerger from Houston, Texas.  We had some difficulty.  Can you

12 hear me?

13              THE COURT:  I can hear you.

14              MR. GERGER:  Thank you.  David Gerger.

15              THE COURT:  Good afternoon.

16              MS. PINEAULT:  And good afternoon, Your Honor.

17 Michael Pineault for Martin Fox as well.

18              THE COURT:  Good afternoon.

19              MR. GERGER:  And Mr. Fox is here as well.  We are

20 in a very huge room, at opposite ends.

21              THE COURT:  Okay.  Hopefully that will work through

22 the sound system here.

23              So we're here for sentencing.  We're proceeding by

24 videoconference, so let me start with that formality and

1    describe the arrangements here.

2            The -- on the screen, on your video, you should

3    see -- Mr. Fox, you should see your lawyer -- lawyers, the

4    prosecutor, the probation officer.  There's also the

5    courtroom deputy and the court reporter.  I am physically

6    present in the courtroom.  The courtroom is not closed, but

7    there's no one here but me.

8            If you have any trouble with the video or the phone

9    connection or you cannot hear or see what's happening, please

10   let me know by speaking up, waving your hand, whatever you

11   need to do.  I will stop the proceeding and try to take care

12   of it.  If you need something repeated or if you would like

13   to have something clarified, please let me know.  The court

14   reporter is making a transcript of the proceeding, but no

15   video of the -- no recording of the video itself will be

16   preserved.

17           And for any individuals also on the line, just to

18   remind you that under our local rule, recording of this and

19   rebroadcasting of this procedure is prohibited by local rule.

20           So, Mr. Fox, you have the right to be physically

21   present in open court for this the sentencing.  You can waive

22   that right.  Before I ask whether you intend to waive that

23   right, you should know the following:

24           Today is November 13, 2020.  We are experiencing a

25   worldwide epidemic caused by COVID-19.  The president of the

1    United States and the governor of Massachusetts have each

2    declared a state of emergency.  Congress has passed an

3    emergency statute that permits defendants in criminal cases

4    to appear in court by video or telephone for certain types of

5    proceedings under certain circumstances.

6            Our normal procedure before the emergency was to

7    have all defendants physically present in the courtroom for

8    proceedings such as these.  We are attempting as best as we

9    can to protect the health and safety of court employees,

10   lawyers, defendants, security personnel, and everyone else

11   who's involved with the court system.  At the same time, we

12   are attempting to permit basic functions of the court to go

13   forward without unnecessary delay.

14           The physical appearance of defendants in the

15   courthouse and transportation to and from the courthouse is

16   likely to increase health risks for all persons involved, as

17   well as the general public.  So to try to minimize the risk,

18   we are, among other things, giving defendants who prefer to

19   appear in court by video the option to do so.  It is

20   voluntary.  You do not have to appear by video.  If you do

21   choose to appear by video, I will ask you to waive your right

22   to be physically present.

23           You also have the right to public proceedings,

24   proceedings such as this to be conducted in open court, in

25   public view.  Again, normal procedure before the pandemic was

1       to have all such proceedings in open court in public view.

2       And, again, the courtroom is open, and we are also -- have

3       announced on our website members of the public have access to

4       our court proceedings.

5               And, Ms. Marchione, do we have members of the

6       public on the line?

7               THE DEPUTY CLERK:  Yes, Your Honor, we do.

8               THE COURT:  Okay.  So, with that, do you understand

9       you have the right to be physically present in open court for

10      your sentencing?

11              THE DEFENDANT:  Yes, Your Honor.

12              THE COURT:  Do you understand you have the right to

13      consult with your lawyer during the sentencing?

14              THE DEFENDANT:  Yes, Your Honor.

15              THE COURT:  Do you understand, if you wish to speak

16      with your lawyer during the sentencing, you just need to let

17      us know, and we will make arrangements for the two of you to

18      have a confidential communication?  Do you understand?

19              THE DEFENDANT:  Yes, I do.

20              THE COURT:  Do you understand you have the right to

21      hear and see everything that happens in court during your

22      sentencing, but because we only have a single camera here,

23      you'll only see part of the courtroom?  You understand that?

24              THE DEFENDANT:  Yes, Your Honor.

25              THE COURT:  Do you understand your family members

1    and other supporters have the right to attend this

2    proceeding, but because we're proceeding in this manner, they

3    will need to do so electronically or by telephone?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  And do you understand that you have the

6    right to speak to me as the judge before I pronounce your

7    sentence, and that if you waive your right to be physically

8    present and you decide to speak before I sentence you, you

9    will have to do so by video?

10              THE DEFENDANT:  Yes, Your Honor.

11              THE COURT:  Have you consulted with your lawyer

12   concerning waiving your right to appear in person?

13              THE DEFENDANT:  Yes, Your Honor.

14              THE COURT:  And do you agree to waive your right to

15   appear in person for this sentencing and instead to appear by

16   video?

17              THE DEFENDANT:  Yes, Your Honor.

18              THE COURT:  And do you also agree that, to the

19   extent that your right to public access to this proceeding is

20   in any way impaired, you waive that right?

21              THE DEFENDANT:  Yes, Your Honor.

22              THE COURT:  And to the lawyers, is there any reason

23   I should not accept the waiver?

24              MR. GERGER:  No, Your Honor.

25              THE COURT:  I find the defendant has knowingly and

1    voluntarily waived his right to appear physically and has
2    knowingly and voluntarily agreed to proceed by
3    videoconference.  I further find that Mr. Fox's sentencing
4    cannot be further delayed without serious harm to the
5    interest of justice.  Mr. Fox has requested that the
6    sentencing proceed so that he may move on with his life, and
7    it is not apparent, given his health, when it will be
8    reasonably safe for him to travel to Massachusetts to appear
9    in person for this sentencing.
10          I also find that the measures taken to provide
11   public access to this proceeding are reasonable under the
12   circumstances and that, to the extent that the defendant's
13   right to public access is in any way impaired, the defendant
14   has knowingly and voluntarily waived that right.  So I accept
15   the waiver, and we'll move forward with these proceedings by
16   videoconference.
17          So in connection with the sentencing, I have
18   reviewed the following documents:  first of all, the
19   indictment filed March 5, 2019; the request for the Rule 11,
20   which had the agreements attached to it; the presentence
21   report prepared on October 9, 2020, and revised on
22   November 6, 2020; the motion for preliminary order of
23   forfeiture; the Government's sentencing memorandum, which was
24   filed November 6, 2020; the defendant's sentencing
25   memorandum, also filed November 6th, and the attached

1    exhibits; the defendant's reply to the Government's

2    memorandum, filed November 10, 2020, and the attached

3    exhibit.

4            And to my knowledge, no other material has been

5    submitted to the Court; is that correct?

6            MS. KEARNEY:  Yes, Your Honor.

7            MR. GERGER:  Yes, Your Honor.

8            THE COURT:  And for probation, was any information

9    withheld from the presentence report pursuant to

10   Rule 32(d)(3)?

11           THE PROBATION OFFICER:  No, Your Honor.

12           THE COURT:  Okay.  And I should say, I have also

13   tried to review -- I have gone back and reviewed the

14   transcript from the Rule 11 hearing, and I have tried to

15   examine as best as I could what's on the public docket of

16   the -- there have been a few sentencings of individuals

17   involved in the overall prosecution here, not the parents,

18   but the other individuals.

19           And so I have looked at the plea agreements on the

20   docket for -- I think it's Mr. Riddell, Mr. -- the one

21   defendant who has been sentenced, Mr. -- the one coach -- two

22   coaches who have been sentenced, and the other plea

23   agreements in this case.  So those are the materials I have

24   reviewed.

25           Ms. Kearney, do you have any other witnesses,

1  victims, anyone else who's going to make a statement here

2  today?

3          MS. KEARNEY:  No, Your Honor.

4          THE COURT:  And, Mr. Gerger, have you had an

5  opportunity to review all the material that was submitted in

6  connection with the sentencing?

7          MR. GERGER:  I have, Your Honor.  Thank you.

8          THE COURT:  And have you had a chance to go over it

9  with the defendant?

10          MR. GERGER:  Yes.

11          THE COURT:  And, Mr. Fox, have you had a chance to

12  review all the material submitted in connection with the

13  sentencing?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  And have you had a chance to discuss it

16  with your counsel?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  Okay.  And the one other housekeeping

19  matter with regard to that, I got an order on the docket this

20  morning, but for defendant's counsel, I did allow you to file

21  under seal.  And to the extent that your memorandum addresses

22  the matter that you requested to file under seal, health and

23  so forth, that's fine; but the other parts of it should be on

24  the public docket marked "redacted," as the Government did.

25  And if you could, when this proceeding is over, put those

1    documents there; it is a matter of public record.

2              Any problem with that?

3              MR. GERGER:  No, Your Honor.

4              THE COURT:  Okay.  So -- and, Mr. Gerger, were you

5    expecting an evidentiary hearing today?

6              MR. GERGER:  No.

7              THE COURT:  Okay.  So with that, let's turn to the

8    presentence report.  And I think the Government's objections

9    go to the calculation, and I will address that.  But let me

10   start with the defendant's objections here.

11             The first two objections by the defendant regarding

12   paragraph 66 and paragraphs 74 to 75, is there still a matter

13   that needs to be addressed there?

14             MR. GERGER:  Your Honor, I don't believe it affects

15   the guideline calculation.  We're simply reflecting what the

16   parties have said, and we're satisfied with the report.

17             THE COURT:  Okay.  And I'm not sure that I

18   completely follow what the -- where the objections are and

19   what the numbers are, how the numbers are resolving.  But do

20   I understand -- for paragraph 66, there's no dispute that

21   Mr. Fox received a $100,000 check from Mr. -- from the KWF

22   count?

23             MR. GERGER:  Correct, Your Honor.

24             THE COURT:  And the correction is the amount that

25   was paid to Mr. Center; is that correct?

1          MR. GERGER:  Yes, Your Honor.

2          THE COURT:  Okay.  I'd like this to be accurate,

3     and -- but I don't want to waste time if we don't have a

4     dispute that matters.  So I will take your representation

5     that you're satisfied with those sections and move on.

6          And, similarly, paragraphs 125, 126, and 129, those

7     have been addressed in your memorandum?

8          MR. GERGER:  Yes, Your Honor.  Thank you.

9          THE COURT:  And the objections at 142 and 144 of --

10    the report has been amended, so no further issue there.

11          So let's turn to the calculations of the

12    guidelines.  And it feels like some of these issues are ones

13    that we dealt with in the other case in front of me, and I

14    guess the question I have -- I understand that you are making

15    the objection because you have a different view of this than

16    the view that I've taken, but is there any -- I guess a

17    couple of questions.

18          Is there anything further that you want to say as

19    to why I should take a different view -- and this is turning

20    to the Government -- other than seeking reconsideration of

21    how I had thought about it before?

22          MS. KEARNEY:  No, Your Honor.  The Government was

23    objecting for the record.  We will rely on what was submitted

24    with the PSR.

25          THE COURT:  So I am overruling your objections and

1    adopting probation's analysis of the guidelines here.  Any

2    further objections that I need to address for the Government?

3              MS. KEARNEY:  No, Your Honor.

4              THE COURT:  Okay.  So with that, let's go through

5    the guideline calculation then.  The base offense level for

6    the racketeering conspiracy is a -- it's a Level 19, and the

7    adjusted offense level is also 19.  Any disagreement with

8    that, other than the objection noted for the record, by the

9    Government?

10             MS. KEARNEY:  No, Your Honor.

11             THE COURT:  Okay.

12             MR. GERGER:  Your Honor, I -- I think we have three

13   points down from that.

14             THE COURT:  For the total offense level?

15             MR. GERGER:  Yes, Your Honor.

16             THE COURT:  Okay.  I'm still at the adjusted

17   offense level.

18             MR. GERGER:  Okay.  Pardon me, yes.

19             THE COURT:  So adjusted offense level of 19 on the

20   guidelines, a three-level decrease for acceptance of

21   responsibility, for a total offense level of 16.  Any

22   disagreement with that?

23             MS. KEARNEY:  Not from the Government, Your Honor.

24             MR. GERGER:  No, Your Honor.

25             THE COURT:  Okay.  And with regard to criminal

1  history, we've got one point which places defendant in

2  criminal history category I.  Any objection to that?

3              MS. KEARNEY:  No, Your Honor.

4              MR. GERGER:  No, Your Honor.

5              THE COURT:  Okay.  So with that, I think I would

6  like to -- so we'll adopt the guidelines as calculated by

7  probation, which gets a possible sentencing as follows:

8              The statutory range here is not more than

9  20 months.  The sentencing guideline range is 21 to

10  27 months' imprisonment; supervised release, a statutory

11  range not more than three years; guideline range, one to

12  three years; a statutory range for probation not less than

13  one nor more than five years; guideline range, ineligible.

14              A fine, the statutory range is not more than

15  250,000; guideline range, 10,000 to 95,000; restitution is

16  not applicable; and forfeiture, under the plea agreement and

17  the Court's preliminary forfeiture order, would be in the

18  amount of $245,000; and a $100 mandatory special assessment.

19              Any disagreement with those calculations?

20              MS. KEARNEY:  No, Your Honor.

21              MR. GERGER:  No, Your Honor.

22              THE COURT:  Okay.  So with that, I'll hear from the

23  Government, your recommendation.

24              MS. KEARNEY:  Thank you, Your Honor.

25              The Government recommends a sentence here of six

1    months' imprisonment, a fine of $95,000, one year of

2    supervised release, forfeiture of $245,000, and a $100

3    special assessment.

4              In coming to this recommendation, the Government

5    weighed heavily the considerations noted in the sentencing

6    memoranda; but even with those considerations, the 3553(a)

7    factors in particular, just punishment, the need to promote

8    respect for the law, and general and specific deterrence

9    necessitate a period of incarceration here.

10             This defendant played a vital role in both aspects

11   of the scheme.  He facilitated the admission of two students

12   as fake athletic recruits and took steps towards a third

13   through his connections with college coaches.  And he enabled

14   Singer to, in Singer's woods, control the Houston testing

15   center through his connection to Niki Williams, thereby

16   facilitating the cheating on college entrance exams for four

17   students.

18             From the presentence report, it appears that

19   Mr. Fox had a happy childhood and lived comfortably.  He

20   didn't need the money Singer paid him, yet as Singer

21   communicated to others, Fox wanted to make sure he was

22   getting something in return.  A couple of the letters

23   submitted in support of the defendant suggests that he is so

24   helpful and charitable that he likely had trouble saying no

25   to Singer.

16

1          I do not doubt that Mr. Fox has engaged in the
2     community service described in his sentencing memorandum, but
3     the work he did with Singer was not charity.  He was
4     compensated well for his role, and it was Mr. Fox who reached
5     out to Singer in October of 2018 asking to be included in and
6     to receive his cut of a potential additional side door with
7     the University of Texas coach, not the other way around.
8          THE COURT:  With regard to the other, I understand
9     on that transaction or on that attempted transaction that
10    Mr. Fox was, in a sense, interjecting himself into that one.
11    On the other matters, to what degree does the Government
12    contend that Mr. Fox was directing the activities, and to
13    what degree do you contend he was following direction?
14         MS. KEARNEY:  So it's a combination, because he
15    acted as a middleman.  So in the other examples of his
16    misconduct, Mr. Singer would reach out to Mr. Fox, but then
17    Mr. Fox took the initiative to figure out a testing site and
18    connect to Niki Williams and also to connect to the other
19    coaches.
20         THE COURT:  So is it the Government's contention
21    that Mr. Fox came up with which coaches to use and which test
22    takers to use or that these ideas were -- these requests were
23    forwarded by Mr. Singer?
24         MS. KEARNEY:  With respect to the University of
25    Texas admission, it was Mr. Fox who, after the approach of

1    one coach did not work, he initiated finding another coach

2    who would be willing to engage in the scheme.

3              With respect to the University of San Diego

4    examples, it was Rick Singer who asked Mr. Fox if he knew

5    anyone at USD.

6              THE COURT:  Okay.

7              MS. KEARNEY:  A number of the other letters

8    submitted in support of Fox were from his former players and

9    their families that he coached in tennis and basketball.

10   Those letters indicated that Fox devoted a significant part

11   of his life to helping underprivileged students improve their

12   athletic skills and get into college; yet at the same time

13   that Fox was helping these students, he was facilitating the

14   admission of fake athletic recruits, effectively stealing

15   slots from the same type of students he was supposedly

16   helping.  And he was enabling cheating on college entrance

17   exams, despite that he was also mentoring his players to

18   apply themselves to their schoolwork.

19             In addition, this was not Fox's first fraud.  He

20   had been involved in a fraud scheme before this case for

21   which he has completed his sentence.  And he was captured on

22   recorded calls in this case attempting to defraud the IRS.

23   All of these factors weigh in favor of an incarcerative

24   sentence, despite the considerations noted in the sentencing

25   memoranda.

1          Indeed, the University of Texas tennis coach who
2    completed only one side door and refused to do a second, who
3    pleaded to a less serious offense and who received
4    substantially less personal profit from the scheme than Fox,
5    was sentenced to six months in prison.
6          Fox's conduct is significantly more egregious, but
7    in light of the considerations noted in the sentencing
8    memoranda, the Government believes that six months in prison
9    is sufficient but not greater than necessary to achieve the
10   goals of 3553(a).
11         Thank you.
12         THE COURT:  Let me ask you a few follow-up
13   questions.  I -- when I was sentencing the parents in the
14   other case, the -- while I disagree -- while I didn't accept
15   the calculation of the guidelines that the Government -- how
16   the Government had reduced the matters to the guidelines, I
17   did find helpful -- and I had noted that there was a brief
18   that was filed that, essentially, was an overview brief with
19   regard to all of the parents and helped at least explain the
20   Government's view of the relative culpability of people
21   involved who were charged in that indictment.
22         And I guess my question here is, in light of my
23   obligations to try to consider similarly situated
24   individuals, it would be helpful to have an understanding
25   from the Government of where you see Mr. Fox fitting in, in

1    the overall indictment, both this one and -- you know,

2    there's the splitting of Mr. Riddell, Mr. Center, Mr. Singer,

3    the Stanford coach whose name I'm not remembering, that some

4    of those were split off, but they're essentially part of the

5    same set of allegations.

6            So are you able to help me with that, essentially,

7    sort of a where -- where -- from the Government's point of

8    view, where do you view sort of levels of culpability between

9    people?

10           MS. KEARNEY:  Yes, Your Honor.  The Government

11   views Mr. Fox as ranging towards the more culpable of those

12   defendants, and that's for a number of reasons.

13           First, he had insight into both the test cheating

14   and the athletic recruitment aspects of the scheme.  He

15   understood how the entire scheme worked.  It wasn't just that

16   he was involved in one piece or another.

17           He also engaged in each of those aspects on

18   multiple occasions, whereas some of the other coaches only

19   did it once or twice.  He recruited additional people to the

20   scheme, additional coaches, the test administrator, and he

21   was doing this purely for personal profit.  He was not

22   putting any money towards an athletic program at a school,

23   for instance.

24           And so, for these reasons, the Government views

25   Mr. Fox as tending towards the more culpable end of the

1    range.

2              THE COURT:  How about Mr. Meredith?  Where does he

3    fit in compared to Mr. Fox?

4              MS. KEARNEY:  Mr. Meredith falls on the lower end

5    of the range.  He had, I believe, only completed one side

6    door.  He may have been involved in a second that was not

7    completed.  And he also cooperated at the outset of the

8    investigation and pled guilty.

9              THE COURT:  I -- the other part of this is I'm

10   trying to figure out how people are situated relative to each

11   other, is that there's somewhat different charges against

12   different individuals.  And I'm trying to figure out

13   whether -- how much that has to do with their different roles

14   in the actions, the matters that are subject to the

15   indictment and how much it had to do with, essentially, how

16   the -- how the charging ended up, whether there was a plea to

17   an information versus a plea to an indictment, versus a plea

18   to a superseding indictment.

19             So it -- I'm not sure I can frame it better.  Is --

20   would you agree with me that people engaged in different --

21   would you agree that people -- or would you state that people

22   engaged in different offenses, or am I simply having to wade

23   through different charging decisions?

24             MS. KEARNEY:  No.  I think, you know, for instance,

25   Michael Center, the University of Texas tennis coach, he was

1    only involved in recruiting one student.  He did not have

2    insight into the larger scheme, and so there would not be a

3    basis to charge him with a RICO conspiracy.

4              In contrast, Martin Fox saw the entire scheme.  He

5    saw the testing aspect.  He saw the athletic recruitment

6    aspect.  He participated in both multiple times.  He didn't

7    want to be cut out of an additional potential time to do it.

8    And so there is -- it's more than just the charging

9    decisions.  It's based on the facts of each case.

10             THE COURT:  How about Riddell?

11             MS. KEARNEY:  So Mark Riddell was only involved in

12   the testing scheme.  He was -- he did it many times.  And so

13   he -- he is one of the more culpable defendants as well.

14             THE COURT:  Am I right that he's not charged with a

15   RICO charge, though?  I don't have that directly in front of

16   me, but that was my note.

17             MS. KEARNEY:  I can pull it up, Your Honor.  I just

18   want to confirm as well.

19             THE PROBATION OFFICER:  Your Honor, Martha Victoria

20   from the probation office.

21             His information is on page 5, paragraph 6, of the

22   presentence report.  He doesn't appear to be charged with

23   RICO.

24             MS. KEARNEY:  Thank you.

25             THE COURT:  Thank you.  Okay.

1           MS. KEARNEY:  But one point of clarification with

2     respect to Mr. Riddell is that he pled preindictment to this

3     case.

4           THE COURT:  Yeah, I mean, but what I'm trying to

5     figure out -- I mean, there's -- under the guidelines,

6     there's a three-point decrease for acceptance of

7     responsibility, and then I'm supposed to try and view similar

8     conduct and similarly situated defendants.  And so to the

9     extent that the difference in a charge is simply a question

10    of when the person accepted responsibility, it feels like we

11    might be double counting.

12          I'm trying to figure out whether the differences in

13    the charges track the differences in conduct versus the

14    differences in when people accepted responsibility.  But what

15    I hear you say is that, from your point of view, Mr. Fox was

16    more culpable than the coaches or the test takers because he

17    was doing both.  Is that -- and because he was engaged more

18    than once.  Is that a fair statement?

19          MS. KEARNEY:  Yes, and that his motivation was just

20    greed.

21          THE COURT:  Okay.  I'm going to come back after

22    I've given defense counsel a chance to speak, but you also

23    include in your memo perhaps delaying report time if I do

24    impose time.  So I want to talk to you about that, but let me

25    let the defense counsel speak first, and then we'll come back

to that.

MR. GERGER:  Thank you, Your Honor.  This is my first time to appear in a case before you.  Thank you very much.

You know, sentencing is such a balancing, often between opposite forces.  We've certainly read the earlier sentences, and on the one hand here, we have deterrence, consistency, and maybe other factors that might call for incarceration, a period of incarceration.

And at the same time, we have Martin's -- if you'll allow me to call him "Martin" -- individual health.  And we focus a good deal on his health, of course, because 3553(a) itself, on its face, and the guideline, on its face, 5(H), talk about medical condition and health and the need for the most efficient healthcare in the guideline and the most effective healthcare in what I hope I can call the "variance statute," 3553(a)(2)(D).

And in addition to just the language of the factors, the beauty of 3553, of course, is this concept of something that is not greater than necessary, the lowest sentence that is sufficient and nothing greater than necessary.  And I think that that's what allows the consideration of the grace and the mercy that we talk about in our pleading, not because those are deserved, because by definition, grace and mercy are not deserved, but they are

1    part of our sentencing scheme.  They're real, and they're

2    good.

3            And so the statute really asks us, is there any

4    other combination of punishments or restrictions that would

5    be sufficient, and is incarceration truly necessary?

6            You know, Your Honor, we have not exaggerated

7    Martin's health problems by one baby aspirin.  And he is not

8    the man that he was when he pled guilty or when you sentenced

9    the other defendants so far.  It is a coincidence that with

10   COVID came Martin's illness.  It was not COVID, as far as we

11   know, but it coincided in time; April 7, 2020, this truckload

12   of bricks hit him.  He's been hospitalized five times.  I

13   learned -- because Martin is so quiet, he didn't tell me -- I

14   learned that he has another hernia.  They fixed the more

15   serious hernia, but he has another hernia.

16           And I very much appreciate the Government's

17   consideration of the medical records that we sent, and the

18   sentencing memorandum of the Government makes an astonishing

19   statement, Your Honor, that a medical center is likely.  Now,

20   that means a care level 4, not 3, but a care level 4 in the

21   Bureau of Prisons.  And that's quite an acknowledgment by the

22   United States of the severity of his problems.

23           What we are saying is, no matter what his needs

24   are, the criterion in the Bureau of Prisons' manual for care

25   level 4 isn't going to be met because Martin is in bad shape,

1    but he does not now have 24-hour nursing care, and he's not

2    living in a hospital.

3             THE COURT:  What's your response to the

4    Government's offer that they would not object to delaying

5    reporting?

6             MR. GERGER:  Well, Your Honor, we're going to come

7    to COVID at the end, but it's a good question.  And we don't

8    know when the current surge will end, but we do know that

9    COVID is not going away.  It's going to be here next year and

10   the year after and the year after.  There might be vaccines.

11   There will be better therapies.

12            And we've been at this with Mr. Fox for well over a

13   year, and that's why we're here today, is to bring his case

14   to an end.  And I think a delay creates a terrible burden

15   because it's indefinite.  And we take Martin as he is right

16   now.  We don't know how he will be in six months.  We don't

17   know where prisons will be in six months or three months or

18   nine months.

19            And so I think that we're at a point where we would

20   ask that this case, really, be over and that Martin be able

21   to know when he can move on with his life.  So I don't know

22   when we would set a surrender date, and whenever it is, COVID

23   is not going to be wiped off the face of this earth.  That's

24   not going to happen, even with a vaccine, just as we have the

25   flu even though we have a vaccine.  And so whether it's now

1    or three months from now, we have a real risk of going to

2    prison.

3         I do want to talk about his health care.  Martin,

4    of course, will also be available, and he wants to speak to

5    you and make a statement to you and answer any questions you

6    have.  He's very stoic and accepting, and I do want to tell

7    you some of what I've observed in him, but first I'm going to

8    skip to the questions you asked the prosecutor, if may.

9         THE COURT:  Uh-huh.

10        MR. GERGER:  I appreciate that Mark Riddell was

11   given the chance to plead guilty before indictment.  We

12   certainly would have done that, but Martin was simply

13   arrested.  He had different counsel at the time, and we did

14   not have that opportunity.

15        And we don't object -- we did not object to the

16   guideline calculation, but Your Honor is correct that the

17   choice of statute drives the guideline calculation.  And I

18   think this concept of relative guilt is so hard.

19        You know, Martin, as we said in our memo, he never

20   talks of himself as less guilty than anybody else.  That's

21   just not how he thinks.  We've tried to address it in our

22   pleading.  You have people who are so different and unique in

23   this case.  You have parents who paid the bribe, which Martin

24   did not do.  He did not fund any of this enterprise of

25   Singer's.

1            You have coaches who accepted bribes and falsified

2    the paperwork of their employer, the university, and

3    committed the act of honest services fraud, their employee,

4    the university, which Martin did not do.

5            And you do have, as the Government says, Martin

6    introducing Singer to two coaches.  He was approached by

7    Singer and said, "Do you have a -- do you know a coach at

8    San Diego?  Do you know a coach at Texas?"  And Martin did.

9    And at some point in those dealings and at some point with

10   Niki Williams, Singer started dealing with those people

11   himself.  So --

12           THE COURT:  But it wasn't just, "Do you know a

13   coach?"  It was, "Do you know a coach who I can bribe?"

14           MR. GERGER:  And fast money too.  You're correct,

15   Your Honor.  And that's why he has pled guilty.

16           And, again, I'm not here arguing -- very hard for

17   me to argue more guilty/less guilty, but I -- I do disagree

18   with the notion that Martin, who did not initiate this scheme

19   and did not fund it and did not violate his duty to the

20   university, is somehow more -- more guilty in the quality of

21   the crime that he committed, even though he was on both

22   sides, or that he saw the entire scheme, if you will.  He

23   wouldn't have known what the parents did to Singer.  He would

24   not have known how the coaches completed the crime, that sort

25   of thing.

1          My -- back to my observations of Martin, because I

2     knew Martin before this last seven months and now I have

3     lived through the most recent seven months with him, and it's

4     really hard for me to imagine going through what Martin is

5     going through in the setting of a prison, and I'll give you a

6     couple of examples, if I may.

7          Martin's stomach, of course, always hurts, always.

8     And then a couple times a week, it hurts worse.  And I have

9     seen, like, there's a glint or a little bit of a start, "Oh,

10    my goodness.  Is the pain going to get -- subside?  Do I have

11    to call my doctor?  Do I need to run down to Methodist

12    Hospital," one of the great hospitals of our city, where,

13    unfortunately, they know Martin.  He doesn't have his own

14    parking spot, but he practically does.

15         And that's a fear to live with, where sometimes you

16    just want to crawl under your covers, but sometimes you're

17    afraid because -- but at least you know, "I could call my

18    doctor at night.  I could go to the emergency room."

19         THE COURT:  Do I have in the record that this is a

20    permanent condition rather than this is a currently severe

21    medical condition?

22         MR. GERGER:  Well, we know -- and, again, what -- I

23    can only go by the doctor's letter, and I cannot pronounce

24    Dr. Karen's last name -- but is -- that it is a recurring

25    condition.  That's how she describes it in Exhibits 1 and 2,

1    "recurring."  That's all I know about it.

2            And -- but it is a fear, you know, is this another

3    attack coming on?  Thanks goodness it wasn't.  But if it were

4    and he were not in a federal medical center, he would really

5    be in distress, and it's a real risk we're talking about.

6            Another example, I think, would be, you know, right

7    now, Martin monitors his blood sugar, as the Court knows,

8    24 hours a day, and we showed you examples from his blood

9    sugar readouts in our most recent -- in our sentencing

10   memorandum.  I don't know what it is right now, but earlier

11   today, Martin was happy it was 190.  Well, maybe it will go

12   down to 100.  But then it's 300, and there's that fear.  "Is

13   it going to come down?  Do I need to call my doctor?  Do I

14   need to go to the emergency room?"  I can't imagine having to

15   do that in the context of being in prison.

16           And we -- again, we just take him as he is, and

17   this is why I said at the beginning, sentencing is such a

18   balancing of competing forces.  Or the hernia, is the hernia

19   going to get worse and need surgery?

20           So now we come to COVID.  Those concerns that I've

21   talked about are concerns without COVID if Martin is in a

22   prison and has one of these episodes.

23           The statistics on the Bureau of Prisons website,

24   Your Honor, are not as good as they used to be when we

25   started doing compassionate release motions.  They were

1    better.  But the medical center in Fort Worth reports on its

2    website 12 deaths to inmates from COVID and yet no current

3    cases, but 12 deaths.

4         The other medical center that would be near

5    Martin's family, in Butner, North Carolina, reports zero

6    deaths, but 109 current cases among inmates of COVID.  And I

7    know that Your Honor has granted a compassionate release

8    motion, and we cited others from the court, the

9    First Circuit.  They're everywhere.

10        Martin would be a textbook candidate with the organ

11   damage that he has had in the last seven months, the

12   malnourishment that comes from not being able to digest food,

13   his diabetes, which is out of control, despite the fact that

14   he's -- he has this fast-acting insulin that he would not

15   have at BOP, that he injects four times a day.  He has

16   anemia, now his hernia.  He really would be a textbook

17   compassionate release candidate.

18        So if we compare the Government's request to our

19   request, in some ways, there's not a great deal of distance

20   between them.  We have six months of prison plus up to three

21   years of supervised release.  And, Your Honor, when -- I'm

22   going to end where I began with this concept that there are

23   other alternatives, and the statute requires us to ask, is

24   there any other way to punish --

25        THE COURT:  Right.  Right.  What are my other

1      alternatives to punish him, not to help him move forward, but

2      to punish him?  What are my other alternatives here?

3              MR. GERGER:  You know, the Supreme Court has said,

4      as we cite in our brief, that probation is punishment.  Now,

5      probation here could last for five years, which would serve

6      the purposes of punishment.  So, you know, I don't think -- I

7      know Your Honor does not mean, you know, physical pain,

8      right, but we're talking about the purposes of punishment.

9              And probation -- we have fines.  We have home

10     confinement.  Even above guideline fines, we have forfeiture.

11     And that is, of course, not in every sense a punishment,

12     except it's a forfeiture of the gross amount.  And the

13     Government is correct that there is a phone call between

14     Mr. Fox and Mr. Singer suggesting this to be a loan, but

15     Singer said no, so taxes were paid.

16             And the forfeiture, of course, is --

17             THE COURT:  But the point there about the comment

18     about the loan and the taxes, to some degree, in trying to

19     assess what the appropriate sentence is, I have to have sort

20     of both how the person approached the crime that was at issue

21     and, second, what happens going forward.

22             And I don't -- I don't diminish that, with all of

23     the defendants in front of me -- frankly, with defendants in

24     almost all cases in front of me -- there's some good things

25     people do.  There are lots of good things people do, but the

1    issues in front of me are, first and foremost, what is

2    happening here in this case?

3          And what -- the conversation about the taxes and

4    the fact that there was a prior fraud claim here, it

5    undermines this suggestion that some of his family members

6    may have had that this was an act of -- you know, whether it

7    was least resistance or being helpful, this was an act of

8    greed that Mr. Fox not only took steps to help himself, but

9    took steps to entwine other people in this -- in this mess:

10    Ms. Williams, the other coach.

11          So these aren't just -- this isn't just sort of we

12    accidentally got here, and so the issue here when I look at

13    it and try to -- I do think very hard about the relative

14    culpability.  You know, I haven't sentenced Ms. Williams yet,

15    but I will have to sentence her.  Do I say, well, you know,

16    this is what you did, this is what Mr. Fox did, but there's

17    no sort of difference in where you go?

18          I mean, there's -- I understand we've got a huge

19    health issue, and I'm not -- I don't mean to minimize that at

20    all.  But I do need to -- before I get to, okay, so how do we

21    deal with this punishment, I do need to have sort of the

22    measure of what I have here.

23          And I have a lot of difficulty envisioning some of

24    the parts of this on the edges that the Government describes

25    as a RICO conspiracy.  It's hard for me to understand how

1      we're talking -- how this is a RICO enterprise.

2              But with Mr. Fox and Mr. Singer, we're getting

3      closer to the middle of what was going on here.  It is a more

4      serious issue.  And so the problem I have to wrestle with

5      here is that if I conclude, as I think I am finding here,

6      that Mr. Fox is one of the more culpable people in front of

7      me, how do I impose a punishment that includes, essentially,

8      a punishment and fits in, in how everyone else will be

9      sentenced here?

10             MR. GERGER:  You know, Judge, first, I don't read

11     the letters as trying to excuse anything as saying this was

12     an act of kindness, but to your question --

13             THE COURT:  Well, and I -- just to be clear,

14     Mr. Fox hasn't claimed that, but I think that there are

15     people who have -- who would like to give him the benefit of

16     the doubt here.  Obviously, he has a lot of people who think

17     very highly of him.

18             MR. GERGER:  And we only included those letters to

19     show you that there's another aspect to the man.

20             But, Your Honor, the -- nobody wants -- nobody will

21     look at this hearing and say, "I want to end up like Martin

22     Fox."  And the pull that you are feeling, that the Court

23     feels -- I can't speak for you -- but we just have to come to

24     terms as well with this unique and dire health situation.

25             And I think we phrased it some way in our reply,

1    something like, this isn't a windfall.  The illness is not a
2    windfall.  If anyone would choose between a period of
3    incarceration versus having -- being so sick and asking for
4    probation, nobody would choose the illness plus the
5    probation.  Nobody.
6           And so eight months ago, we wouldn't be in this
7    position.  We would not be arguing about this.  We wouldn't
8    be discussing this.  But at least what the Supreme Court has
9    said is the other arsenal is probation, fines, and home
10   confinement.
11          I haven't mentioned community service as
12   punishment, but I think community service is added because it
13   not only elevates the person who receives the help, but it
14   elevates the person who is giving the help.  And it's a
15   rehabilitation, if you will, which the statute tells us is
16   the purpose of punishment.
17          So I would include in the definition of punishment
18   all these purposes that are to be served.  And it's not only
19   retribution, or some courts have called it vengeance.
20   "Retribution" is probably a better word.  It's not only about
21   retribution.
22          And we didn't -- we didn't want to be here in this
23   health condition, but that's the reality.  And I don't --
24   it's not to say that the Court has no choice.  Not at all.
25   But I've not had a client with this kind of recurring risk,

1    of sending someone to prison in his condition.  And that's
2    why I started by saying we have a balance of opposite
3    interests.  And the health risk here is so severe that we're
4    begging you to consider those other arrows in the arsenal,
5    Your Honor, that you have at your disposal.
6              I don't want to stop talking until I've answered
7    your question, you know, but that's what -- that's the
8    position we're in.
9              THE COURT:  Okay.  So with regard to -- other than
10   the incarceration issue, the remainder of your recommendation
11   is what?
12             MR. GERGER:  Your Honor, the things that I'm aware
13   you can impose are probation, with whatever strict conditions
14   are imposed upon him, including home confinement for a period
15   of any time; fines, even an above guideline fine is at the
16   Court's disposal.
17             I say community service, and I think, Your Honor,
18   you will see in our memo we have reached out to two wonderful
19   organizations in Houston who want Martin to work for them.
20   Houston Children's Charity knows Martin.  They will put him
21   to work up to -- I forget the number of hours we had in our
22   paper.  They have a project where they deliver clothes to
23   needy children, and Martin is able to drive a car and do
24   that.  Meals on Wheels in Houston delivers meals to
25   home-bound, needy seniors.

1          So as far as I'm concerned -- and Martin is

2    concerned -- he would do any community service that would

3    allow him to still be with his medical providers as needed

4    and really get his hands dirty.  I'm not talking about

5    working at a -- the Nutcracker Market at Christmas, but these

6    are real needs in our community and that our probation office

7    in Houston puts people to work at.

8          And I'm sure that Ms. Victoria has other conditions

9    of probation that can be imposed, but those are the things

10   that come to my mind that would ensure a punishment for

11   Martin given his condition.

12         THE COURT:  Ms. Kearney, really, two questions for

13   you.  The one is, Mr. Gerger suggests that we're not that far

14   apart because you're at six months and he is at -- well,

15   you're at six months.  But I understand that to be driven

16   specifically by the health issues as opposed to --

17         MS. KEARNEY:  Sorry, Your Honor.

18         THE COURT:  In the absence of the health issues,

19   where is your recommendation?

20         MS. KEARNEY:  In the absence of the health issues,

21   the Government would have sought 12 months and a day in

22   prison.

23         THE COURT:  Okay.  And so I think my question then

24   to you is, given your recognition of the medical issues, what

25   amount of time would you have in mind to get past the risk

1    posed by COVID, one; and, two, how do you respond to what

2    Mr. Gerger said about a designation, Mr. Fox's designation,

3    to a medical facility?

4            MS. KEARNEY:  So on the first piece, in terms of

5    delaying the report date, the Government would suggest

6    perhaps about six months.  The Government notes that Mr. Fox

7    has not been hospitalized for a recurrence of his condition

8    since July, so that would put him close to a year to give him

9    time to both get his condition stabilized, to give doctors

10   more time to figure out the cause of why it is occurring,

11   which I think, from the medical records provided, they had

12   not yet determined that, and also to get his diabetes under

13   control.

14           And that would also give time for the COVID

15   pandemic and any potential vaccine to be deployed or the

16   COVID pandemic to abate.  So that's where the Government

17   stands in terms of timing of when he would report.

18           THE COURT:  I'm sorry; I didn't -- as you said it,

19   I didn't register.  Did you say in the summer, or did you say

20   six months?  I'm sorry, I didn't --

21           MS. KEARNEY:  Well, I said about six months, and --

22   which would put us towards the summer.

23           THE COURT:  Okay.

24           MS. KEARNEY:  And then regarding the comments about

25   the federal medical center, I had reached out to an attorney

1    with the Bureau of Prisons regarding Mr. Fox's condition to

2    confirm that the bureau could, one, handle his care -- which

3    he assured me that they could.  He did say, though, that the

4    bureau will not do a full medical review and reach a

5    designation for Mr. Fox until he is sentenced and the U.S.

6    Marshals request that the Bureau of Prisons house him.

7            At that time, Mr. Fox would receive a preliminary

8    designation.  The attorney that I spoke with is -- one of his

9    responsibilities includes health management, and based on his

10   experience and my summary of Mr. Fox's conditions, he

11   believed that Mr. Fox would be designated either care level 3

12   or care level 4 and -- housed at a federal medical center so

13   that he could be close to a hospital if necessary, as opposed

14   to a facility that was more rural.

15           But that said, this was based on my representations

16   to him about the -- about Mr. Fox's condition, and it was not

17   a full medical review, which would not be done until he is

18   sentenced.

19           THE COURT:  Once he's sentenced, there is a report

20   time; and if we extend the time to report, does that mean

21   they won't do this calculation until immediately before

22   reporting, or would they do it earlier?

23           MS. KEARNEY:  I do not know the answer to that,

24   Your Honor.  It might be that they wait so that they could

25   get the most up-to-date medical records, but I do not know.

1          THE COURT:  Okay.

2          MR. GERGER:  Your Honor, may I ask my co-counsel,

3     Mr. Pineault --

4          THE COURT:  Go ahead.

5          MR. GERGER:  Do you have anything to help us out?

6          MS. PINEAULT:  Just briefly, Your Honor, two things

7     I would say.

8          One, you asked, quite understandably, what do you

9     say to the "Niki Williamses" in this case when they're

10    wondering why you imposed one sentence on them that may be

11    harsher than what you're contemplating for Mr. Fox right now,

12    and I think the obvious answer is his health, which is

13    unique.

14         He is not somebody who is just trying to -- and I

15    don't mean to trivialize other people's arguments, but he's

16    not trying to take advantage of the moment and the pandemic

17    to make an argument for more lenient treatment.  He truly has

18    this condition.

19         The second point is, Mr. Gerger made an analogy to

20    people seeking compassionate release; and in that situation,

21    the focus, as it should be, is on that person's health and

22    the conditions that justify, or not, their requests for

23    compassionate release.  Courts aren't focused on going back

24    in time and trying to -- to compare and contrast their

25    culpability relative to their co-defendants.  The focus is

1    appropriately on their condition in that moment at that time,

2    and that's in large part where we are with Mr. Fox.

3            So we all appreciate the difficulty of what you're

4    doing and the importance to you and, appropriately, to the

5    system of trying to put people on a spectrum and sentence

6    them proportionately according to where they fit on that

7    spectrum, but the huge difference here is health, and that's

8    why we've spent so much time talking about it.

9            THE COURT:  So why isn't the answer, then, that I

10   sentence him as I might think that -- based on everything

11   else, and then he seeks compassionate release based on the

12   health?

13           MS. PINEAULT:  And I guess -- I would respond to

14   that, Your Honor -- you could, as a procedural matter, I

15   suppose, but to what end?  You know, he is as he is today.

16   He's presenting as he presents today, and isn't it

17   appropriate to take that into account today rather than to

18   sort of superimpose an additional procedural step?

19           MR. GERGER:  I would add to that, Your Honor, we

20   don't really know what the sentencing commission and Congress

21   is going to end up doing with compassionate release tomorrow.

22   We know that today compassionate release motions reference

23   3553(a).  And so I suppose the answer to your question that I

24   would give is that the health issues are before us today, as

25   they are in every sentencing.

```
 1                    And I was looking at the math.  I think Mr. Fox
 2       pled guilty something like 13 months ago.  And while he will
 3       comply with whatever you order, we're here to try to bring
 4       this case -- and I would include in that, this sentencing --
 5       to an end.  And I don't have much confidence in, number one,
 6       how he will be classified or treated regardless of COVID, but
 7       we also don't know what the situation will be in six months
 8       with COVID or his health.
 9                    And so our plea is --
10                    THE COURT:  So -- so why do his sentencing now?
11       The rest of the defendants are all -- we're doing those in
12       the late spring.
13                    MR. GERGER:  Because he's done his -- his work with
14       the Government, Your Honor.  He is not in good health, and we
15       think it's prudent to do it now.  I think the parties all
16       agree to that.
17                    THE COURT:  Well, he has a right to do it now.
18       It's our Speedy Trial Act, and I don't think there's any
19       disagreement that he can have this settled now.  The problem
20       is you're presenting me with these questions where it seems
21       that we have big unknowns with regard to the health as we sit
22       here today.
23                    Okay.  Mr. Fox, did you want to address me before I
24       impose sentence?
25                    THE DEFENDANT:  Yes, Your Honor.
```

1          I'm ashamed for what I've done.  My parents raised
2     me better than this.  They taught me and my sisters values.
3     My sisters have done fine, but I let them all down.  I should
4     have said no when Singer approached me.  Instead I said yes
5     because of the money.
6          I do not blame Singer or anyone but myself.  I am
7     ashamed of it.  I know it was wrong and, since my arrest,
8     have done what I can to accept responsibility and plead
9     guilty in the Government's investigations.  I can't change
10    what I did, but I can try and make it right.
11         I also feel badly bringing up my health.  I don't
12    want people thinking I'm trying to get out of anything.  I
13    didn't plan to get so sick last April.  I'm dealing with it
14    the best I can.
15         Facing this illness certainly puts things like
16    money in perspective.  No matter my sentence, I'm going to go
17    back to working with people one on one, doing whatever my
18    health lets me do.  Looking back, I know now that helping
19    people is what has been most rewarding to me.
20         Thank you for giving me a chance to speak.  I know
21    you have a tough decision to make.  I just want you to know
22    how sorry I am for what I did to make us all be here today.
23         Thank you.
24         THE COURT:  Thank you.
25         I'm going to take a five-minute recess.

1          If I leave, can you let me back in again?

2          THE DEPUTY CLERK:  Court is in recess.

3          Yes, Judge, I can.

4          (Court in recess at 3:47 p.m.

5          and reconvened at 3:56 p.m.)

6          THE DEPUTY CLERK:  We're back on the record.

7          THE COURT:  So I would like to confer with

8    probation on how I am going to put this together.  Is there

9    any objection from the defendant or the Government?

10          MR. GERGER:  No, Your Honor.

11          MS. KEARNEY:  No, Your Honor.

12          THE COURT:  Can you put Ms. Victoria and me in a

13   breakout room, please?

14          THE DEPUTY CLERK:  Yes, Your Honor, right away.

15          (Court in recess at 3:57 p.m.

16          and reconvened at 4:06 p.m.)

17          THE COURT:  Are we all back?  No.  There we go.

18          I was trying to figure out if we could do something

19   slightly different than usual, how we can work it, and as

20   usual, the guidelines are not as creative as I'd like to be.

21          So I have considered the sentencing factors under

22   3553(a).  The offense here is a substantial and serious

23   offense.  The -- Mr. Fox's role in this was significant, and

24   recruiting others and bringing others into this is -- was a

25   particularly troubling part of all of this.

1          The defendant's personal history and

2   characteristics -- he is obviously a man who has done many

3   things right in his life and has support from friends and

4   family that appear to be extremely warranted and shows the

5   good that he is -- has done and is capable to do.

6          At the same time, this was an offense of greed that

7   the defendant really had no reason to be doing and no

8   justification for doing it and following another -- I know I

9   don't have much details about the earlier crime, but it is

10   troubling that -- you hope a brush with the law and the first

11   time would have led Mr. Fox to the straight and narrow, and

12   that's not what happened.

13          At the same time, I am very concerned about the

14   defendant's health.  There doesn't seem to be any piece of

15   this which is exaggerated.  He does -- the physical

16   difficulties he's had in the last few months are not anything

17   that I can minimize.

18          So I'm faced with a very difficult choice here.  I

19   have an indictment that covers a lot of people.  He seems to

20   be towards the top of the food chain of who was doing what

21   both in terms of the amount of money involved and the two

22   different schemes.  At the same time, there is this

23   substantial health issue.

24          I am going to include a period of incarceration and

25   a period of home confinement.  It is my hope that by delaying

sentencing -- I'm sorry -- delaying the report date, we can get past both the worst of the COVID pandemic and also allow for Mr. Fox's health to stabilize.  So I will accommodate requests on the report date, but it is in order to ensure that the sentence does reflect the seriousness of the offense and is a just punishment and affords -- avoids unwarranted sentencing disparities.  I am -- I am including a period of incarceration.

And so the sentence that I intend to impose is a period of three months incarceration followed by three months of home confinement, a total of 15 months of supervised release, the first three months being the home confinement, and then 12 months of supervised release thereafter; 250 hours of community service; a $95,000 fine; forfeiture as set forth in the motion, that's $245,000; a $100 special assessment.

And special conditions on supervised release, paying balance of the fine imposed according to a court-ordered schedule, prohibited from incurring new credit charges or opening additional lines of credit without the approval of probation while financial obligations remain outstanding; provide probation access to financial information, which may be shared with the financial litigation unit of the U.S. Attorney's Office while fines remain outstanding; participating in a mental health

1    treatment program as directed by the probation office.

2           And the home detention, do we need to -- do I need

3    to worry about doing that with location monitoring, or should

4    I start it with location monitoring and remove it?  I know in

5    these COVID days -- and this question is, Ms. Victoria, for

6    you:  In light of the COVID concerns, are we starting out

7    with location monitoring equipment or not?

8           THE PROBATION OFFICER:  Your Honor, it's generally

9    the preference that they be on location monitoring.  It's

10   easier to monitor.  I think that what I -- you can either

11   order it, and then if that's too burdensome, then they can

12   petition you to take it off, or you can say location

13   monitoring at the discretion of the probation office.

14          He will be supervised in his home state, so I don't

15   know exactly how they're handling things down there.  So you

16   could either -- I would suggest either start it off with

17   location monitoring or leaving location monitoring to the

18   discretion of the supervising probation office.

19          THE COURT:  Okay.  I'll start off with it, then.

20   And so that's the sentence I intend to impose.  Any

21   objections before I formally impose it?

22          MS. KEARNEY:  No, Your Honor.

23          MR. GERGER:  We understand, Your Honor.

24          THE COURT:  So, Mr. Fox, pursuant to the Sentencing

25   Reform Act of 1984 and having considered the sentencing

1    factors enumerated at 18 U.S.C. Section 3553(a), it is the

2    judgment of the Court that the defendant, Martin Fox, is

3    committed to the custody of the Bureau of Prisons to be

4    imprisoned for a term of three months.

5              And I will make a judicial recommendation that you

6    be designated to an institution commensurate with security

7    where the Bureau of Prisons can afford appropriate medical

8    care for your documented medical needs and to do so in as --

9    I think you gave me two areas near Houston and --

10             MR. GERGER:  Your Honor, if I may, it's the Federal

11   Medical Center at Fort Worth --

12             THE COURT:  I can't -- I -- the Bureau of Prisons

13   is not interested in my designating a specific facility, but

14   they will accommodate the characteristics of it.  So if you

15   can give me the locations you are looking for it being

16   closest to, I will make the request in those words.

17             MR. GERGER:  Well, I guess -- we live in Houston,

18   Your Honor, so it is -- but I suppose, given the medical

19   emergency here, we would request Fort Worth or Butner.  But

20   are you saying that you cannot recommend a medical center,

21   Your Honor?

22             THE COURT:  I'm saying that I will make a request

23   that you be designated to the facility with appropriate

24   medical care and to do so near -- and I'm asking you for near

25   where.  So near Houston are the facilities that you're

1    looking for?

2              MR. GERGER:  Your Honor, I believe it will be

3    Houston.  Would you allow me to confer with Mr. Fox, because

4    we had hoped that if this moment came, you would be able to

5    recommend a medical center.  May I confer with him about

6    whether it -- he would request Houston or where his sister

7    lives in North Carolina, and I could simply communicate that

8    to your case manager later today?

9              THE COURT:  Yeah, I mean, I can put it -- I can put

10   it that way in the judicial recommendation.  I mean, I can --

11   I'm happy to anticipate that it may be a medical center, but

12   they're going to make that determination.  And so to the

13   extent that I can give guidelines that they're happy to

14   listen to rather than their feeling I'm telling them their

15   job, I will be more effective.

16             MR. GERGER:  Well --

17             THE COURT:  So --

18             MR. GERGER:  -- I guess I'll confer with Mr. Fox,

19   but our hope is, is you would consider in the recommendation

20   saying "medical center," and I know they're going to

21   designate as they will, and you've seen the report that we've

22   provided from the expert.

23             We would hope that they will designate to a medical

24   center as the Government forecasts, but I think that a

25   recommendation from you, Your Honor, to the medical center

1    Fort Worth or medical center Butner is something that they

2    would consider.  I do think that they would consider a

3    recommendation in those terms.

4              THE COURT:  That's not what they tell us, that

5    those -- that isn't the way they want it formulated.  So,

6    again, I will -- I will put in here a recommendation to be

7    designated to an institution commensurate with security where

8    the Bureau of Prisons can afford appropriate medical care for

9    the defendant's documented medical needs.

10             I'll add in parentheses "a medical center."

11             MR. GERGER:  Thank you.

12             THE COURT:  But give me the locations you want.  In

13   the vicinity of --

14             MR. GERGER:  I would say --

15             THE COURT:  -- Dallas Fort Worth or --

16             MR. GERGER:  Fort Worth, Texas, or Butner,

17   Louisiana -- Butner, North Carolina, which is near his

18   sister, by coincidence.

19             THE COURT:  Okay.  I will -- I will include that.

20             MR. GERGER:  Thank you, Your Honor.

21             THE COURT:  Upon release from imprisonment, you

22   shall be placed on supervised release for a term of

23   15 months.  Within 72 hours of release from custody, you

24   shall report in person to the district to which you are

25   released.

1          I am imposing a $95,000 fine and forfeiture per the

2     motion in the amount of 245,000.  Payment of the fine will

3     begin during supervised release according to a court-ordered

4     repayment schedule and a $100 special assessment, which is

5     due immediately.

6          While on supervised release, you must comply with

7     the following terms and conditions:  You must not commit

8     another federal, state, or local crime.  You must not

9     unlawfully possess a controlled substance.  You must refrain

10    from any unlawful use of a controlled substance.  You must

11    submit to one drug test within 15 days of release from

12    imprisonment and at least two periodic drug tests thereafter,

13    not to exceed 104 tests per year.  You must cooperate in the

14    collection of DNA as directed by the probation officer.

15         You shall not possess a firearm, ammunition,

16    destructive device, or any other dangerous weapon.  You shall

17    comply with the standard conditions that have been adopted by

18    the Court, which are described at sentencing guideline

19    Section 5D1.3(c) and which will be set forth in detail on

20    judgment.

21         You must pay the balance of any -- of the fine

22    imposed according to a court-ordered repayment schedule.

23    You're prohibited from incurring new charges or opening

24    additional lines of credit without the approval of the

25    probation office while any financial obligations remain

1    outstanding.  You must provide the probation office access to

2    any requested financial information, which may be shared with

3    the financial litigation unit of the U.S. Attorney's Office.

4         You must participate in a mental health treatment

5    program as directed by the probation office.  You shall be

6    required to contribute to the costs of evaluation, treatment

7    programming, and/or monitoring based on the ability to pay or

8    availability of third-party payment.  You must complete

9    250 hours of community service at an agency approved by the

10   probation office.

11        And you must serve the first three months of

12   supervised release in home detention with location monitoring

13   and equipment and shall pay for the costs of the program as

14   determined under the national contract.  You're responsible

15   for returning the monitoring equipment in good condition and

16   may be charged for replacement or repair of the equipment.

17        This sentence is imposed for all the reasons

18   previously stated and because I believe the sentence in all

19   its components is reasonable and is sufficient but not

20   greater than necessary to accomplish the goals of sentencing

21   consistent with 18 U.S.C. Section 3553 and the Supreme

22   Court's guidance.

23        Appellate rights -- the plea agreement you've

24   entered into with the Government limits your rights of

25   appeal.  You have waived your right to challenge your

1   conviction on direct appeal or in a future proceeding.

2   You've also waived your right to file a direct appeal or

3   challenge in a future proceeding any sentence of imprisonment

4   of 27 months or less or any orders relating to supervised

5   release, fines, forfeiture, and restitution.

6           You may still appeal on the grounds of ineffective

7   assistance of counsel or prosecutorial misconduct, and if

8   you're unable to pay appeal costs, you may ask for permission

9   to appeal in forma pauperis.

10          So the sentence is imposed as stated.  In terms of

11  a self-report date, I'm -- the Government had suggested about

12  six months before self-reporting, but if you don't want to

13  push it that far out, we can set it to an earlier date.

14          MR. GERGER:  Your Honor, at least in my experience

15  with this, this will go to the BOP to make a designation, and

16  then they will notify us of a report date and -- so I would

17  suggest we -- we go through that normal process, and if we

18  then need to ask for an extension, I know the Court has the

19  authority to impose an extension at that time.

20          THE COURT:  So I'm happy to have the defendant

21  released now and report in a -- I think we normally -- six

22  weeks, 12 -- there's a normal time that it takes them to do

23  the calculation.  Is that 12 weeks normally, six weeks

24  normally?

25          THE PROBATION OFFICER:  Your Honor, normally, for a

1    medical designation, it takes the Bureau of Prisons six to

2    eight weeks for a medical designation.  So my suggestion

3    would be you do set a date certain, no matter if it's eight

4    weeks out or six months out; and then if that needs to be

5    moved up or moved back, then the parties can motion you

6    accordingly.  But your judgment does need a set date in it.

7              THE COURT:  Right.  So I will put a date in at

8    either six or eight weeks.  I think eight weeks might be

9    better in light of all the COVID things that the facilities

10   are dealing with, and they will give you a designation that

11   you would self-report to.  And if you need to ask me to move

12   the date, you can do that by motion.

13             MR. GERGER:  Thank you, Your Honor.

14             THE COURT:  So we need a date eight weeks out,

15   Ms. Marchione.

16             THE DEPUTY CLERK:  Judge, I have Friday,

17   November 13th.

18             MR. GERGER:  January 13th?

19             THE DEPUTY CLERK:  November.

20             THE COURT:  That can't be eight weeks.

21             THE DEPUTY CLERK:  Oh, I apologize, Judge.  I'm in

22   the wrong screen.

23             THE PROBATION OFFICER:  Your Honor, while she's

24   looking for a date, I just wanted to clarify the number of

25   hours of community service.  Did you say 250 or 350?

1          THE COURT:  I meant to say 250.  I may have had a

2     slip of the tongue, but I meant to say 250.

3          THE PROBATION OFFICER:  Okay.  Thank you.

4          THE DEPUTY CLERK:  And, Judge, I apologize.  I have

5     Friday, January 8, 2021.

6          THE COURT:  Okay.  So we have a January 8th report

7     date, and they will let you know where to report to.

8          Mr. Fox's failure to surrender for service of the

9     sentence will result in punishment of a fine or imprisonment

10    of not more than ten years if -- no, sorry -- yeah, not more

11    than ten years, and the term of imprisonment would be

12    consecutive to the sentence of any other offense.  And if

13    you -- I think that's it.  If you commit a crime while you're

14    on release, that's also a consecutive sentence in addition to

15    that.

16         So with that, is there anything further we need to

17    deal with today?

18         MS. KEARNEY:  Not from the Government, Your Honor.

19         MR. GERGER:  No, Your Honor.

20         MS. PINEAULT:  No, Your Honor.

21         THE COURT:  Mr. Fox, I wish you recovery of your

22    health, and I hope that you will have sufficient time to

23    recover.  If you do have additional surgery that you need to

24    have now -- there was a mention of that -- you should get

25    that scheduled.  Let your counsel know, and if we need to

1    move the date to accommodate your surgery and recover from
2    your surgery, we will do that.
3                 THE DEFENDANT:  Thank you, Your Honor.
4                 MR. GERGER:  Thank you very much, Judge.
5                 THE COURT:  Okay.  Thank you.  We're in recess.
6                 (Court in recess at 4:27 p.m.)

1                **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4          I, Robert W. Paschal, Registered Merit Reporter and

5   Certified Realtime Reporter, in and for the United States

6   District Court for the District of Massachusetts, do hereby

7   certify that pursuant to Section 753, Title 28, United States

8   Code, the foregoing pages are a true and correct transcript

9   of the stenographically reported proceedings held in the

10  above-entitled matter and that the transcript page format is

11  in conformance with the regulations of the Judicial

12  Conference of the United States.

13

14                          Dated this 16th day of

15  November, 2020.

16

17

18

19

20                     /s/ Robert W. Paschal

21          _____

22          ROBERT W. PASCHAL, RMR, CRR
            Official Court Reporter
23

24

25